**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ROBOTIC   VISION   TECHNOLOGIES   LLC,   a
Nevada Limited Liability Company, and
FREDERICK WEIDINGER, an Individual,                  Case No.:  1:11cv250 (TSE/TRJ)

                           Plaintiffs,

v.

ADIL SHAFI, an Individual,

                           Defendant.

                                         /

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs Robotic VISION Technologies LLC and Frederick Weidinger, through their attorneys, Dickinson Wright PLLC, allege as follows in support of their First Amended Complaint against Defendant Adil Shafi:

## THE PARTIES

### A.  The Plaintiffs

1.    Plaintiff Robotic VISION Technologies LLC ("RVT") is a Nevada limited liability company with a principal place of business in Great Falls, Virginia.  Its constituent members are all citizens of Virginia.

2.    RVT designs, develops, and deploys software and peripherals, and provides support and training services for vision-guided robotics and machine vision systems.

3.    On May 24, 2010, RVT purchased all of the assets of Braintech, Inc. ("Braintech"), at public auction, including, but not limited to, all contract rights, commercial tort

claims, patent and trade secret rights, agreements, and confidential information, as well as any claims for damages by way of any past, present, or future infringement of such rights.

4.      Plaintiff Frederick Weidinger ("Weidinger"), an individual, resides in the State of Virginia.  Weidinger is currently Chief Executive Officer and member of RVT.

## B.  The Defendant

5.      Defendant Adil Shafi ("Shafi"), an individual, resides in Brighton, Michigan.

6.      Shafi is President, Secretary, Treasurer, Director, and Chief Executive Officer of Advenovation, Inc.

7.      Advenovation sells support and training services and designs, develops and deploys software for vision-guided robotics and machine vision applications.

8.      Shafi is also the majority shareholder of Advenovation, with 92.5% of the outstanding shares.

## JURISDICTION AND VENUE

9.      Complete diversity of citizenship exists in this matter because Plaintiff RVT is a citizen of Nevada and Virginia, Plaintiff Weidinger is a citizen of Virginia, and Defendant Shafi is a citizen of Michigan for purposes of determining diversity jurisdiction.

10.     The amount in controversy is greater than $75,000 exclusive of interest, costs, and attorneys' fees.  Shafi admits that he has received in excess of $150,000 in 2009 and 2010 in relation to his work for his new company, Advenovation, which was performed in breach of his contractual obligations to, and in unfair competition with, RVT, resulting in upwards of $75,000 in lost potential profits to RVT.  Shafi has also unfairly competed with RVT in the vision-guided robotics and machine vision market, as well as disparaged and defamed RVT, RVT's

predecessor, Braintech, and Weidinger, personally, to current customers and others directly engaged in the vision-guided robotics and machine vision industry. The machine vision industry is a multi-billion dollar industry, presenting the opportunity for multi-million dollar vision software sales, support and training annually for RVT. Plaintiffs have suffered significant damages, in excess of $75,000, to the extent that Shafi's improper conduct has prevented them from realizing their full potential in the vision-guided robotics and machine vision software market. RVT has also suffered over $203,000 in out-of-pocket expenses that RVT's predecessor, Braintech, advanced to Shafi and his companies as a result of Shafi's misrepresentations and breach of warranties. In addition, Braintech suffered approximately $1,990,000 in the lost benefit of its bargain related to the Share Purchase Agreement between Shafi and Braintech, as a result of various material misrepresentations and breaches of warranty by Shafi in relation to the Share Purchase Agreement and other agreements.

11. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(1) & (c)(1) because complete diversity exists between Plaintiffs and Defendant and the amount in controversy is greater than $75,000 exclusive of interest, costs, and attorneys' fees.

12. Defendant Shafi is subject to personal jurisdiction in this District by virtue of, *inter alia*, the fact that he conducted business activities in Northern Virginia, that directly relate to the claims in this matter, including, but not limited to, negotiating and agreeing to various agreements at issue in this matter in Great Falls, Virginia, and traveling, working and staying in Great Falls, Virginia, and McLean, Virginia, in relation to his prior employment as an officer and director of Braintech, which had its principal place of business in Virginia, as well as receiving

payments and benefits from Braintech initiated from Virginia, all of which give rise to the claims in this matter.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

14.     Plaintiffs hereby incorporate paragraphs 1 through 13 as if fully set forth herein.

**A.**  **Braintech Purchases Shafi's Indebted Companies and Intellectual Property**

15.     Prior to its sale to RVT in 2010, Braintech was a publicly-traded vision-guided robotic and machine vision software technology company that designed, developed, and sold vision software and related technology and provided support and training services for vision recognition and robot guidance technologies for manufacturing, logistics, material handling, automation, and situation security and reconnaissance applications.

16.     Prior to August 12, 2008, Shafi was President and sole owner of SHAFI, Inc., ("SI") and SHAFI Innovation, Inc. ("SII").

17.     SI and SII provided simplified software solutions for vision-guided robotics, as well as support and training services.

18.     On or about June 19, 2008, Braintech and Shafi entered into a non-binding confidential Letter of Intent setting forth Braintech's proposal to purchase all of the outstanding capital stock of SI and 80% of the outstanding capital stock of SII, which would result in both SI and SII becoming separate operating subsidiaries of Braintech.

19.     On June 5, 2008, prior to the execution of the Letter of Intent, Braintech advanced $50,000 to Shafi.  Shafi represented that this $50,000 was required to essentially keep the lights

on at SI and to keep SI operating, and to satisfy its business creditors regarding late payments. However, without prior disclosure to Braintech, Shafi misappropriated $7,500 from these funds for his own personal use.  Shafi subsequently misappropriated an additional $19,740 for his personal use from a second advance for payment to SI business creditors of $50,000 by Braintech.

20.     On or about August 12, 2008, Braintech entered into a series of six agreements with Shafi in his individual capacity and as President of SI and SII,  collectively referred to as the "Sale Agreements":

   a.   Share Purchase Agreement, which included a number of detailed schedules;

   b.   Lock-Up Agreement;

   c.   Employment Agreement;

   d.   Non-Competition Agreement;

   e.   Letter Agreement Regarding Indebtedness of SI and SII; and

   f.   Promissory Note.

21.     Three of the Sale Agreements, namely, the Share Purchase Agreement, the Non-Competition Agreement, and the Promissory Note are specifically at issue in this matter and discussed more thoroughly below.

**B.  Shafi Breaches His Personal Warranties Set forth in the Share Purchase Agreement**

22.     On or about August 12, 2008, Braintech entered into the Share Purchase Agreement with Shafi in his individual capacity as the sole owner and President of SI and SII.  A copy of the Share Purchase Agreement is in Defendant's possession.

23.     Pursuant to the Share Purchase Agreement, Braintech agreed to acquire all of the outstanding stock of SI and 80% of the outstanding stock of SII, free and clear of all encumbrances.  *See* Share Purchase Agreement, §§ 2.1 & 2.2.

24.     The purchase price consisted of 2,999,700 shares in the capital stock of Braintech to be issued at closing and 1,000,000 shares to be issued upon the achievement of specified performance criteria.  *See id.*

25.     Shafi personally and expressly warranted that certain material representations contained in the Share Purchase Agreement were true and correct, *see id.,* Art. 3 & § 7.2.1, including, but not limited to, representations that:

    a.  SI's intellectual property, including, but not limited to, its product known as Reliabot, had economic value, an established and continuing customer base, and was revenue ready, *see, e.g., id.* §§ 3.5.3, 3.26, 7.2.1, Schedule 3.9, & Schedules 3.26(a), (b), (c) & (d);

    b.  SI had an established revenue pipeline that could be used to pay existing SI debt identified in the Share Purchase Agreement and related schedules, *see, e.g., id.* §§ 3.5.3, 3.26, 7.2.1, Schedule 3.9, Schedule 3.9, & Schedules 3.26(a), (b), (c) & (d);

    c.  SI debts identified in the Schedules to the Share Purchase Agreement were accurate; *see, e.g., id.* §§ 3.5.3, 7.2.1; and

    d.  SI had an established customer base and associated good will, *see, e.g., id.* §§ 3.5.3, 3.26, 7.2.1, & § 3.5.3, Schedule 3.9 & Schedules 3.26(a), (b), (c) & (d).

26.     Shafi again reiterated his representations and warranties that SI's Reliabot product was "revenue ready" and scheduled to generate significant revenue beginning in the third quarter of 2008 during a two-day off-site company executive meeting in Canada following the closing of the Share Purchase Agreement.  A revenue schedule demonstrating this was produced as an output of the meetings and distributed to all participants, including Shafi.

27.     Based on Shafi's warranties, the Share Purchase Agreement provided that Braintech would cause SI to satisfy certain accepted indebtedness of SI based on the revenue

pipeline generated by SI, which Shafi warranted were accurate and existed. The SI accepted indebtedness that Braintech agreed to cause SI to satisfy from its revenue commitments was referred to as the "Braintech Accepted Debt." *See, e.g., id.* § 6.3.

28.    Under this structure, it was negotiated, agreed, represented, and warranted that Braintech would be able to net out the revenue from SI's pipeline revenue commitments against the Braintech Accepted Debt. *See* Share Purchase Agreement, § 3.5.3 & Schedule 3.9. The SI pipeline revenues as depicted and committed to by Shafi in the Braintech Accepted Debt Schedule over the thirteen month schedule equates to the SI debt payments over the same period of time, resulting in a mathematical netting effect.

29.    The total SI pipeline revenue for August through December 31, 2008, was represented by Shafi as $260,000, with an additional $810,000 to be generated by August 30, 2009. However, no revenue was ever generated from SI.

30.    In the fourth quarter of 2008 and after the Sale Agreements were executed, Braintech learned that numerous and material warranties Shafi made in the Sale Agreements were in fact false and fraudulent.

31.    For example, it became apparent that revenue-ready commitments and revenue pipeline account receivable schedules warranted by Shafi were fraudulently produced and materially misleading and that, in fact, neither SI, nor SII, had an established revenue pipeline and SI's intellectual property was, in fact, not market ready and scalable.

32.    It also became apparent that SI's intellectual property, including Reliabot, had no continuing economic value in the market place and was not revenue ready.

33.    For example, upon reviewing the Reliabot software and source code after closing, Braintech discovered that it was written in an old unsupported programming language and it's

algorithms for unstructured random bin picking were not advanced or very scientific.  Moreover, Reliabot's robot interfacing capabilities were antiquated, slow, and very simplistic.  It also did not include the requisite documentation and training to create solutions, and there was no list of robot programs or robot communication modules associated with it.  And only four, rather than the represented fifteen, manufacturer communication interfaces were ever integrated into the Reliabot software.  As a result, no single piece of Reliabot source code was ever deemed sufficient and therefore, never adopted nor utilized by Braintech.

34.    Braintech also learned after closing that SI did not have a fully trained channel network of 100 integrators selling engineering and training for, or supporting, Reliabot in the field, and that Shafi had not personally produced the technology source codes to operate Reliabot.  Rather, the source codes were either created by former employees of SI and/or SII who had not been paid and would have nothing to do with SI or SII going forward or were outsourced to third parties that refused to engage with Shafi any longer.

35.    In order to conceal that neither SI, nor SII, had an established revenue pipeline and that SI's intellectual property was, in fact, not market ready and scalable, Shafi prohibited Braintech from reviewing the Reliabot software and source code prior to closing or from confirming Shafi's representations with any of his represented customers before closing.  In fact, Shafi did not provide the Reliabot technology to Braintech for examination until several weeks post closing after numerous requests from Braintech to do so.

36.    It also became apparent that the information Shafi provided for the Access & Acceleration Plan, which was expressly warranted by Shafi to be true and accurate, was fraudulently produced and materially misleading, and that Shafi never intended to fully execute

the actions and intent of the Plan, which were critical to the sale.  In fact, Shafi was a no- show for many of the customer meetings scheduled in the Access & Acceleration Plan.

37.     During post-closing meetings with various customers identified by Shafi on the Access & Acceleration Plan and warranted by Shafi to be SI's established customer base and part if its good will, Braintech learned that the customers were not satisfied with Shafi or his companies, that Shafi had borrowed money in advance from various customers for development costs and never delivered the ordered product or service, and that many customers did not want anything to do with Shafi or any company associated with Shafi.  After closing was the first time Braintech was allowed by Shafi to meet with these identified customers in the Access & Acceleration Plan.

38.     Based on these discussions, Braintech also learned that after closing of the Share Purchase Agreement, Shafi was contacting and falsely informing creditors that Braintech had assumed all of the liabilities of SI, that the debts were now directly Braintech liabilities, and that all amounts would be paid in full by Braintech.

39.     Braintech also discovered that the SI checking accounts, from which the Braintech Accepted Debt was to be paid, had been closed because they were overdrawn.  As a result, Braintech was forced to pay various amounts of Braintech Accepted Debt from its own accounts.

40.     Shortly after learning the revenue commitments from the pipeline were not being realized, Braintech had a series of conversations with Shafi both regarding Shafi's warranties and Shafi's performance or lack thereof in relation to the Sales Agreements.

41.     For example, on October 1, 2008, Braintech instructed Shafi to cease informing creditors that Braintech had assumed SI's liabilities.

42.     Nonetheless, Shafi continued to misrepresent that Braintech had agreed to pay certain SI obligations, including past wages of former employees.  The effect was to immediately discredit Braintech in its marketplace and materially damage its reputation.

43.     As a result of Shafi's breaches of warranty, Braintech suffered damages, including, but not limited to:

> a.  The loss of the ability to collect on a Promissory Note by SI and SII to Braintech in the amount of $100,000, *see* Promissory Note, a copy of which is in Defendant's possession.;
>
> b.  Over $103,000 in out-of-pocket expenses, in addition to the $100,000 Promissory Note, related to debts its predecessor, Braintech, paid as a result of Shafi's misrepresentations and breach of warranties; and
>
> c.  Approximately $1,990,000 in the lost benefit of its bargain related to the Share Purchase Agreement between Shafi and Braintech.

## C.  Shafi Willfully Breaches the Terms of His Non-Competition Agreement By Starting His Own Company, Advenovation, to Unfairly Compete with RVT in the Vision-Guided Robotics Software Industry

44.     To enable Braintech to more fully secure the benefits of the transaction and the protection and maintenance of SI and SII's good will and confidential information that was acquired by Braintech, Braintech required Shafi to enter into a Non-Competition Agreement effective August 12, 2008.  A copy of the Non-Competition Agreement is in Defendant's possession.

45.     Under the Non-Competition Agreement, Shafi agreed for a period of three years from the date of the agreement, or one year from the date of termination of his employment with Braintech, whichever was later, not to directly or indirectly, whether as an employee, operator, agent, independent contractor, consultant, owner, director, officer, shareholder, investor, general

or limited partner, joint venture, guarantor or any other relationship, anywhere in North America or Europe:

    a.  Engage in, or assist any other person or entity to engage in, any business that competed with SI or SII in the machine vision software industry or any business in which SI, SII, Braintech, or their affiliates where engaged in at any time during the twelve months preceding termination of Shafi's employment with Braintech; *see* Non-Competition Agreement, ¶ 1(b)(i); or

    b.  Provide to any other entity that was a client or prospective client of SI, SII, Braintech, or their affiliates, as of the date of Shafi's termination of employment with Braintech or during the immediately preceding twelve months, products or services directly or indirectly competitive with SI or SII in the machine vision software industry or any business in which SI, SII, Braintech, or their affiliates where engaged in at any time during the twelve months preceding termination of Shafi's employment; *see id.* , ¶ 1(b)(ii).

46.    The Non-Competition Agreement also contains a Non-Disparagement Provision, under which Shafi expressly agreed for a period of three years from the date of the agreement, or one year from the date of termination of his employment, whichever was later, to refrain from knowingly engaging in conduct "that involves the making or publishing of written or oral statements or remarks (including, without limitation, the repetition or distribution of derogatory rumors, allegations, negative reports or comments) that are disparaging, deleterious or damaging to the integrity, reputation or good will of one or more Covered Parties [including Braintech] or their respective management, officers, employees, independent contractors or consultants." *See* Non-Competition Agreement, ¶ 2(b).

47.    In the event he breached the Non-Competition Agreement, Shafi expressly agreed to entry of an injunction restraining such conduct without the necessity of Braintech proving actual damages or posting bond or security. *See* Non-Competition Agreement. ¶ 5.

48.    Shafi's employment with Braintech was terminated for good cause on November 24, 2008.

49.     Advenovation filed Articles of Incorporation on December 5, 2008.   Upon information and belief, Advenovation's Articles of Incorporation were filed, and Advenovation was created, at Shafi's direction, and was immediately in business selling software products, training and support in direct competition with Braintech and now RVT.

50.     Advenovation sells support services and training, and designs and develops software for vision-guided robotics and machine vision applications.

51.     In February 2009, Shafi became President, Secretary, Treasure, Director, Chief Executive Officer, and the sole employee of Advenovation, Inc.

52.     Shafi and his company, Advenovation, competed directly with Braintech prior to its public auction sale, and now compete directly with RVT, with respect to the provision of support and training services, software, and solutions for vision-guided robotics and machine vision applications.

53.     Advenovation holds itself out to the public as having "experience with over 300 successful robotic installations in the manufacturing industry."   *See* Exhibit 1, Advenovation Website.  This representation is false and is based upon SI and SII's alleged robotic installations, good will, and brand.

54.     Advenovation holds itself out to the public as having the "#1 Ranking for Bin Picking by Google.com."   *See id*.  This is the same representation Shafi made about Reliabot prior to its acquisition by Braintech, and which, upon Braintech's post-closing evaluation, was discovered to be grossly misstated.

55.     Advenovation also holds itself out to the public as having an "[a]ssociation with 16+ robot companies" and an "[a]ssociation with 80+ integrators."  *See id*.  This representation is

false and is also based on SI and SII's alleged former associations with robotic companies and integrators.

56.     Advenovation also holds itself out to the public as having "more than 300 solutions for various vertical applications such as auto racking, bin picking, 3D measurement, inspection, flexible feeding, path following, machine tending, etc." *See id*.  Again, these representations are false and are based on SI and SII's alleged Reliabot customer solutions.

57.     Shafi sold the alleged good will and "brand" of SI, SII, and Reliabot to Braintech and does not have the legal right to use SI, SII, or Reliabot's information or alleged accomplishments in the promotion of his work or that of his company, Advenovation.

58.     In breach of the Non-Competition Agreement and in unfair competition with RVT, Shafi has used SI and SII's alleged accolades and customer contacts to solicit business on behalf of his new company, Advenovation.

59.     For example, in 2009, Shafi approached former SI customer, Hutchinson, about supplying software solutions and support services.  Hutchinson was identified on the Access & Acceleration Plan developed as part of the Braintech transaction.  Shafi has since provided tens of thousands of dollars of software and support services to Hutchinson in breach of his Non-Competition Agreement.

60.     In breach of his Non-Competition Agreement, Shafi has also sold support services to Mark One Corporation, Robotechnology Center, and former SI customer H.H. Barnum/Chrysler.

61.     Shafi also pursued an opportunity for military robots on behalf of Advenovation in early 2010.  Shafi had represented this same opportunity as an opportunity for Braintech during his short employment with the company.

13

62.     In further breach of his Non-Competition Agreement, in early 2010, Shafi became a sales representative for Aptura Machine Vision Solutions.

63.     Aptura specializes in machine vision systems integration for a wide variety of industries, "[p]roviding custom turnkey machine vision solutions, engineering services, and technical support," including 2D and 3D robotic guidance.  *See* Exhibit 2, Aptura Website. Aptura, and specifically its owner, David Dechow, were also hired by Shafi to develop the original Reliabot source code and perform various subsequent work developing specific Reliabot customer applications.  As such, Aptura was a competitor of Braintech prior to its sale and is a competitor to RVT today.

64.     Shafi is identified on Aptura's website as one of its sales representatives.  *See id*.

65.     Shafi sells systems integration projects, engineering services, and support services related to machine vision systems on behalf of Aptura.

66.     Shafi knows that his ownership of, and work in relation to, Advenovation, as well as his work for Aptura, violate the terms of his Non-Competition Agreement.

67.     As a result of Shafi's breach of the Non-Competition Agreement, RVT has, at a minimum, lost the potential profit on at least $150,000 worth of sales.

**D.   Shafi Disparages and Defames RVT and Weidinger During
       Discussions with Business Contacts and Customers.**

68.     In addition to directly competing with Braintech and then RVT, Shafi has in the past, and continues today to, disparage Braintech, RVT, and Weidinger personally, to others in the vision-guided robotics and machine vision system industries.

69.     Shafi's disparaging comments are a direct violation of the non-disparagement provision contained in the Non-Competition Agreement and are defamatory.

70.     After closing of the Share Purchase Agreement, Shafi contacted and falsely informed creditors that Braintech had assumed all of the liabilities of SI, that the debts were now directly Braintech liabilities, and that all amounts would be paid in full by Braintech, and that Braintech was at fault for any defaults or nonpayment issues experienced by SI's creditors.  This is patently false.

71.     For example, Shafi represented to Cognex, a supplier of vision and identification software and products, including software and products that were incorporated into Reliabot, that Weidinger fraudulently induced him into selling his companies, had committed a fraud on him, had done a great injustice to him, and did not hold to his agreements.  Shafi further represented to Cognex that Braintech was in a poor situation, had issues and problems both technically and financially, and did not hold to its agreements.

72.     Shafi made the same or similar statements to at least the following companies:

    a.  Microscan, a supplier of automatic identification and machine vision systems, solutions, and products to various industries, including the automotive industry;

    b.  PDSI, another a supplier of automatic identification and machine vision systems, solutions, and products; and

    c.  Former Braintech exclusive customer, ABB.

73.     At the time he made the above statements, Shafi knew the statements violated the non-disparagement provision in his Non-Competition Agreement.

74.     As a result of Shafi's breach of the non-disparagement provision in his Non-Competition Agreement and related defamation, RVT and Weidinger have suffered significant damages, in excess of $75,000, to the extent that Shafi's improper conduct has damaged their reputation and prevented them from realizing their full potential in the vision-guided robotics and machine vision software market.

## COUNT I
## BREACH OF SHARE PURCHASE AGREEMENT WARRANTIES

75.     Plaintiffs hereby incorporate paragraphs 1 through 74 as if fully set forth herein.

76.     The Share Purchase Agreement is a binding and enforceable contract.

77.     Shafi personally and expressly warranted that certain material representations contained in the Share Purchase Agreement were true and correct, *see id.,* Art. 3 & § 7.2.1, including, but not limited to, representations that:

   a. SI's intellectual property, including, but not limited to, its product known as Reliabot, had economic value, an established continuing customer base, and was revenue ready, *see, e.g., id.* §§ 3.5.3, 3.26, 7.2.1, & Schedule 3.9 & Schedules 3.26(a), (b), (c) & (d);

   b. SI had an established revenue pipeline that could be used to pay existing SI debt identified in the Share Purchase Agreement and related schedules, *see, e.g., id.* §§ 3.5.3, 3.26, Schedule 3.9, & Schedules 3.26(a), (b), (c) & (d);

   c. SI debts identified in the Schedules to the Share Purchase Agreement were accurate; *see, e.g., id.* §§ 3.5.3, 7.2.1; and

   d. SI had an established customer base and integrator network for sales, and associated good will, *see, e.g., id.* §§ 3.5.3, 3.26 & Schedule 3.9 & Schedules 3.26(a), (b), (c) & (d).

78.     The representations made and warranted by Shafi were, in fact, not true and correct.  For example:

   a. The revenue-ready commitments and revenue pipeline account receivable schedules warranted by Shafi were fraudulently produced and materially misleading as neither SI, nor SII, had an established revenue pipeline and SI's intellectual property was, in fact, not market ready.  No dollar of revenue was ever generated by the alleged Shafi pipeline and technology.

   b. The information provided by Shafi for the Access & Acceleration Plan , which was expressly warranted by Shafi to be true and accurate, was fraudulently produced and materially misleading, and he never intended to fully execute the Plans' actions and intents, which were critical to the sale. Not one customer was generated for the benefit of Braintech from the Shafi alleged customer base and Shafi failed to attend numerous customer meetings as targeted in the Access & Acceleration Plan.

    c.   Neither SI nor SII had an established customer base or good will in the marketplace.

    d.   There was no fully trained channel network of 100 integrators capable of selling and supporting the Reliabot product in the field.  Not one integrator sold one dollar of Reliabot software.

    e.   SI's intellectual property, including Reliabot, had no continuing economic value in the market place.  No single piece of Reliabot source code was ever deemed sufficient and therefore, never adopted nor utilized by Braintech.  Reliabot's algorithms for unstructured random bin picking were written in an old unsupported programming language and were not advanced or very scientific, and its robot interfacing capabilities were antiquated, slow, and very simplistic.  It also did not include the requisite documentation and training to create solutions, and there was no list of robot programs or robot communication modules associated with it.  And only four, rather than the represented fifteen, manufacturer communication interfaces were ever integrated into the Reliabot software.  Moreover, Shafi had not personally produced the technology source codes to operate Reliabot.  Rather, the source codes were either created by former employees of SI and/or SII who had not been paid and would have nothing to do with SI or SII going forward or were outsourced to third parties that refused to engage with Shafi any longer.

79.    Braintech suffered damages as a direct result of Shafi's breach of warranties, including, without limitation:

    a.   The loss of the ability to collect on a Promissory Note by SI and SII to Braintech in the amount of $100,000, *see* Promissory Note, a copy of which is in Defendant's possession.;

    b.   Over $103,000 in out-of-pocket expenses, in addition to the $100,000 Promissory Note,  related to debts its predecessor, Braintech, paid as a result of Shafi's misrepresentations and breach of warranties.  and

    c.   Approximately $1,990,000 in the lost benefit of its bargain related to the Share Purchase Agreement between Shafi and Braintech.

## COUNT II
## BREACH OF NON-COMPETITION AGREEMENT

80.    Plaintiffs hereby incorporate paragraphs 1 through 79 as if fully set forth herein.

81.    The Non-Competition Agreement is a binding and enforceable contract.

17

82.     Under the Non-Competition Agreement, Shafi agreed not to compete directly or indirectly with Braintech or its affiliates, and not to disparage Braintech, its affiliates, management, officers, or employees.  *See* Non-Competition Agreement, ¶¶ 1(b) & 2(b).

83.     Shafi has breached the terms of the Non-Competition Agreement by creating a company and acquiring a majority interest in, acting as an officer, director, and sole employee of, and soliciting orders and opportunities on behalf of, Advenovation, which competed directly with Braintech prior to its sale, and now competes directly with RVT, which purchased all assets, including all contractual rights and claims of Braintech.

84.     For example, as set forth above, Shafi has solicited orders from prior Braintech customers Hutchinson and H.H. Barnum, and potential Braintech/RVT customers Mark One Corporation and Robotechnology Center.

85.     Shafi has also breached the non-disparagement provision in the Non-Competition Agreement by making disparaging comments about Braintech and Weidinger to others in the vision guided robotics and machine vision systems industries, including without limitation, to representatives of Cognex, Microscan, PDSI, and former Braintech exclusive customer, ABB.

86.     Shafi's disparaging comments include, without limitation, that Weidinger fraudulently induced him into selling his companies, stole his companies and had committed a fraud on him, had done a great injustice to him, and did not hold to his agreements, and that Braintech was in a poor situation, had technical and financial issues and problems, and did not hold to its agreements.  All of which were untrue.

87.     Shafi's breaches have caused and will continue to cause Plaintiffs irreparable injury and damage by breaching the terms of the Non-Competition Agreement, improperly taking potential business away from Braintech, and then RVT, and damaging the reputation of

Braintech, RVT, and Weidinger within the vision guided robotics and machine vision systems industries.

88.     Shafi's breaches have also caused Braintech, and now RVT, damages in the form of lost sales.

89.     Shafi admits that he personally received in excess of $150,000 in 2009 and 2010 in compensation as a result of his work on behalf of Advenovation, which was performed in violation of his Non-Competition Agreement.

90.     Moreover, the machine vision industry is a multi-billion dollar industry, presenting the opportunity for multi-million dollars of vision software sales as well as support and training services annually by RVT.  Plaintiffs have suffered significant damages, in excess of $75,000, to the extent that Shafi's improper conduct has prevented them from realizing their full potential in the vision-guided robotics software market.

91.     Plaintiffs will suffer further irreparable injury, for which there is no adequate remedy at law, unless and until Shafi is enjoined from further breaches of the Non-Competition Agreement.

92.     As a further remedy for Shafi's blatant and willful breach of the Non-Competition Agreement, Plaintiffs request that the Court equitably extend the non-competition period by an amount of time equal to the time that Shafi has been in violation of the Agreement.


## COUNT III
## DEFAMATION

93.     Plaintiffs hereby incorporate paragraphs 1 through 92 as if fully set forth herein.

94.     Shafi has made specific material false and defamatory statements regarding Braintech, RVT and  Weidinger to dozens within the vision-guided robotics and machine vision

systems industries, including without limitation, to representatives of Cognex, Microscan, PDSI, and former Braintech exclusive customer, ABB.

95.     Shafi's false and defamatory statements include, without limitation, that Weidinger fraudulently induced him into selling his companies, stole his companies, had committed a fraud on him, had done a great injustice to him, and did not hold to his agreements, and that Braintech was in a poor situation, had issues and problems both technically and financially, and did not hold to its agreements.

96.     Shafi was not privileged to make such statements.

97.     Shafi knew the statements were false when made or, in the alternative, Shafi made such statements maliciously or negligently.

98.     By their very nature, Shafi's false, defamatory statements prejudiced Braintech, RVT, and Weidinger in the conduct of their business and/or had the affect of deterring others from dealing with Braintech, RVT, and/or Weidinger.

99.     Shafi's comments concern Braintech, RVT, and  Weidinger's business reputation and ability to do business, and as such, constitute defamation *per se*.

100.    Shafi's breaches have caused and will continue to cause Plaintiffs irreparable injury and damage by breaching the terms of the Non-Competition Agreement, improperly taking potential business away from Braintech, and then RVT, and damaging the reputation of Braintech and Weidinger within the vision-guided robotics and machine vision systems industries.

101.    As a result of Shafi's wrongful conduct, Plaintiffs have suffered substantial economic injury, loss of good will, harm to their reputation, and loss of business opportunities.

102.     Shafi's breaches have caused Braintech, and now RVT, damages in excess of $75,000 in the form of lost sales and the lost benefit of the bargain related to the Share Purchase Agreement.

## COUNT IV
## UNFAIR COMPETITION

103.     Plaintiffs hereby incorporate paragraphs 1 through 102 as if fully set forth herein.

104.     Shafi has used false and misleading statements on Advenovation's website that are derived from Reliabot's purported commercial success and SI and SII's alleged commercial relationships, good will, and brand.

105.     For example, Shafi holds Advenovation out to the public as having:

106.     "[E]xperience with over 300 successful robotic installations in the manufacturing industry;"

107.     The "#1 Ranking for Bin Picking by Google.com,"

108.     An "[a]ssociation with 16+ robot companies" and an "[a]ssociation with 80+ integrators."

109.     "[M]ore than 300 solutions for various vertical applications such as auto racking, bin picking, 3D measurement, inspection, flexible feeding, path following, machine tending, etc."

110.     Each of these representations is false as applied to Advenovation and are actually based on Reliabot and SI and SII's alleged commercial success, commercial relationships, good will, and brand, which were transferred to Braintech.

111.     Shafi made the statements knowing that they were false and misleading as applied to Advenovation.

112.     The comments on Advenovation's website are false and intended to mislead the public and appropriate for Shafi and his new company, Advenovation, the purported value of Reliabot, SI, and SII's reputation.

113.     Through the wrongful and deceptive conduct set forth above, including, but not limited to, the misleading statements on Advenovation's website that are based on Reliabot and SI and SII's alleged commercial relationships, good will, and brand, which were transferred to Braintech, Shafi has put himself and his new company, Advenovation, in a position to unfairly compete with Plaintiff RVT with respect to the provision of software and support services for vision-guided robotics and machine vision solutions.

114.     Shafi's wrongful conduct is a violation of the common law regarding unfair competition.

115.     Shafi has caused and will continue to cause Plaintiffs irreparable injury as a result of his unfair competition.  Plaintiffs will suffer further irreparable injury, for which there is no adequate remedy at law, unless and until Shafi is enjoined from engaging in any further unfair competition with Plaintiffs.

116.     Shafi admits that he personally received in excess of $150,000 in 2009 and 2010 in compensation as a result of his work on behalf of Advenovation.

117.     Moreover, the machine vision industry is a multi-billion dollar industry, presenting the opportunity for multi-million dollars of software sales, as well as support and training services annually for RVT.  Plaintiffs have suffered significant damages, in excess of $75,000, to the extent that Shafi's unfair competition has prevented them from realizing their full potential in the vision-guided robotics software market.

## <u>DEMAND FOR JUDGMENT</u>

WHEREFORE, Plaintiffs Robotic VISION Technologies LLC and Frederick Weidinger

respectfully request that the Court:

a. Extend the non-competition period set forth in the Non-Competition Agreement by an amount of time equal to the time that Shafi has been in violation of the Agreement;

b. Issue permanent injunctive relief prohibiting Defendant Adil Shafi from any further participation in Advenovation and Aptura until the expiration of the extended Non-Competition Agreement;

c. Issue permanent injunctive relief prohibiting Defendant Adil Shafi from further disparaging and defaming Braintech, RVT, and/or Weidinger to potential customer and business acquaintances;

d. Enter a judgment in favor of Plaintiffs and against Defendant Adil Shafi on all Counts;

e. Award Plaintiffs compensatory damages in a sum to be determined resulting from Defendant Adil Shafi's conduct set forth above;

f. Requiring Defendant Adil Shafi to disgorge any ill-gotten gains of his improper conduct, including, but not limited to, any amounts he received and is currently receiving as compensation and profits from Advenovation or Aptura;

g. Awarding Plaintiffs punitive and/or exemplary damages in an amount to be determined; and

h. Award such other legal and equitable relief as the Court may deem just and proper under the circumstances, including interest and attorney's fees.

## **JURY DEMAND**

Plaintiffs Robotic VISION Technologies LLC and Frederick Weidinger, through their attorneys, Dickinson Wright PLLC, request a trial by jury of all claims set forth above so triable.

Respectfully submitted,

s/ H. Jonathan Redway
H. Jonathan Redway (Va. Bar. No. 42189)
jredway@dickinsonwright.com
DICKINSON WRIGHT PLLC
1875 Eye St, N.W., Suite 1200
Washington, D.C.  20006
Tel:  202.659.6946
Fax:  202.659.1559

Thomas G. McNeill (MI Bar No. P36895)
TMcNeill@dickinsonwright.com
Michelle L. Alamo (MI Bar No. P60684)
MAlamo@dickinsonwright.com
DICKINSON WRIGHT PLLC
500 Woodward Ave, Suite 4000
Detroit, Michigan 48226
Tel:  313.223.3500
Fax:  313.223.3598

Dated:  June 6, 2011

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 6, 2011, the foregoing FIRST AMENDED COMPLAINT was electronically filed with the ECF of the Eastern District of Virginia and served upon counsel of record via electronic notice.

s/Michelle L. Alamo

DETROIT 49763-1 1207939v2